1  BILL LOCKYER
   Attorney General of the State of California
2  ROBERT R. ANDERSON
   Chief Assistant Attorney General
3  MARY JO GRAVES
   Senior Assistant Attorney General
4  BRIAN R. MEANS
   Supervising Deputy Attorney General
5  BRIAN G. SMILEY
   Deputy Attorney General
6  State Bar No. 180658
     1300 I Street
7    P.O. Box 944255
     Sacramento, CA 94244-2550
8    Telephone: (916) 324-5286
     Fax: (916) 324-2960
9    Email: Brian.Smiley@doj.ca.gov
   Attorneys for Respondents

10
                    IN THE UNITED STATES DISTRICT COURT
11
                   FOR THE EASTERN DISTRICT OF CALIFORNIA
12

13  **EDWARD DON BROWN,**                    CIV S-05-1195 LKK DAD P

14                              Petitioner,

15        **v.**

16  **WARDEN YATES, et al.,**

17                             Respondents.

18

19          **ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS;**
               **POINTS AND AUTHORITIES IN SUPPORT THEREOF**
20

21

22

23

24

25

26

27

28

1

# TABLE OF CONTENTS

2

**Page**

3  MEMORANDUM OF POINTS AND AUTHORITIES                    5

4  STATEMENT OF THE CASE                                  5

5  STATEMENT OF FACTS                                     6

6  STANDARD OF REVIEW                                     10

7  ARGUMENT                                               11

8      I.    GROUND 1:  PETITIONER HAS FAILED TO SUSTAIN HIS
             BURDEN OF DEMONSTRATING ENTITLEMENT TO
9            FEDERAL HABEAS RELIEF ON THE GROUND THAT HE
             WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL      11
10
       II.   GROUND 2: PETITIONER HAS FAILED TO DEMONSTRATE
11           ENTITLEMENT TO FEDERAL HABEAS RELIEF BASED ON
             THE MANNER IN WHICH THE TRIAL COURT RECEIVED
12           HIS NO CONTEST PLEA                             15

13     III.  GROUND 3: PETITIONER HAS FAILED TO DEMONSTRATE
             ENTITLEMENT TO FEDERAL HABEAS RELIEF ON THE
14           GROUND THAT HE WAS DENIED EFFECTIVE ASSISTANCE
             OF APPELLATE COUNSEL                            17

15  CONCLUSION                                             19

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Bargas v. Burns*
179 F.3d 1207 (9th Cir. 1999)                                        16

*Blackledge v. Allison*
431 U.S. 63 (1977)                                                   16

*Boardman v. Estelle*
957 F.2d 1523 (9th Cir. 1992)                                        11

*Bousley v. United States*
523 U.S. 614 (1998)                                                  15

*Boykin v. Alabama*
395 U.S. 238 (1969)                                                  15

*Brady v. United States*
397 U.S. 742 (1970)                                                  15

*Brecht v. Abrahamson*
507 U.S. 619 (1993)                                              11, 19

*Evitts v. Lucey*
469 U.S. 387 (1985)                                                  17

*Gerlaugh v. Stewart*
129 F.3d 1027 (9th Cir. 1997)                                        18

*Gray v. Greer*
800 F.2d 644 (7th Cir. 1986)                                         18

*Hendricks v. Calderon*
70 F.3d 1032 (9th Cir. 1995)                                         14

*Hill v. Lockhart*
474 U.S. 52 (1985)                                                   12

*In re Lawler*
23 Cal.3d 190 (1979)                                                 10

*In re Patton*
178 Cal. 629 (1918)                                                  10

*In re Swain*
34 Cal.2d 300 (1949)                                                 10

*Jones v. Barnes*
463 U.S. 745 (1983)                                                  18

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF AUTHORITIES  (continued)**

                                                                    Page

*Jones v. Smith*
  231 F.3d 1227 (9th Cir. 2000)                                      17

*Killian v. Poole*
  282 F.3d 1204 (9th Cir. 2002)                                      11

*Kim v. Villalobos*
  799 F.2d 1317 (9th Cir. 1986)                                      11

*Kimmelman v. Morrison*
  477 U.S. 365 (1986)                                             12, 13

*Miller v. Keeney*
  882 F.2d 1428 (9th Cir. 1989)                                      18

*North Carolina v. Alford*
  400 U.S. 25 (1970)                                                 15

*Odle v. Calderon*
  884 F. Supp. 1404 (N.D. Cal. 1995)                                 18

*Odle v. Woodford*
  238 F.3d 1084 (9th Cir. 2001)                                      18

*Parke v. Raley*
  506 U.S. 20 (1992)                                              15, 16

*People v. Bradford*
  15 Cal.4th 1229 (1997)                                             15

*Smith v. Robbins*
  528 U.S. 259 (2002)                                             17, 18

*Strickland v. Washington*
  466 U.S. 668 (1984)                                         12, 13, 17

*Tollett v. Henderson*
  411 U.S. 258 (1973)                                                12

*Wiggins v. Smith*
  539 U.S. 510 (2003)                                                13

*Wildman v. Johnson*
  261 F.3d 832 (9th Cir. 2001)                                       17

*Ylst v. Nunnemaker*
  501 U.S. 797 (1991)                                                11

**TABLE OF AUTHORITIES  (continued)**

1

**Page**

2

**Constitutional Provisions**

United States Constitution
  Fifth Amendment                                          15
  Sixth Amendment                                          15
  Fourteenth Amendment                                     15

**Statutes**

28 United States Code
  § 2254(d)                                           10, 11
  § 2254(b)(2)                                              2
  § 2254(b)(3)                                              2

Penal Code
  § 25                                                 12, 14
  § 25.5                                                   12
  § 1016                                                   15
  § 1026                                               12, 14
  § 1027(a)                                                13
  § 1367                                                   12
  § 1368                                                   14

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1  BILL LOCKYER
   Attorney General of the State of California
2  ROBERT R. ANDERSON
   Chief Assistant Attorney General
3  MARY JO GRAVES
   Senior Assistant Attorney General
4  BRIAN R. MEANS
   Supervising Deputy Attorney General
5  BRIAN G. SMILEY
   Deputy Attorney General
6  State Bar No. 180658
    1300 I Street
7   P.O. Box 944255
    Sacramento, CA 94244-2550
8   Telephone: (916) 324-5286
    Fax: (916) 324-2960
9   Email: Brian.Smiley@doj.ca.gov
   Attorneys for Respondents
10

              IN THE UNITED STATES DISTRICT COURT
11
              FOR THE EASTERN DISTRICT OF CALIFORNIA
12

13  **EDWARD DON BROWN,**                     CIV S-05-1195 LKK DAD P

14                              Petitioner,   **ANSWER TO PETITION FOR
                                              WRIT OF HABEAS CORPUS;**
15       **v.**                               **POINTS AND AUTHORITIES
                                              IN SUPPORT THEREOF**
16  **WARDEN YATES, et al.,**

17                              Respondents.

18

19         Pursuant to the order of this Court, Respondents James A. Yates, Warden of Pleasant

20  Valley State Prison in Coalinga, California, et al., answer the petition for writ of habeas corpus as

21  follows:

22         1.   Petitioner EDWARD DON BROWN is duly and lawfully confined pursuant to a

23  valid judgment of the Superior Court of the State of California, County of Butte, case number

24  CM014629.

25         2.   On April 11, 2002, Petitioner pleaded no contest to assaulting a peace officer with

26  use of a firearm, kidnapping with use of a firearm and infliction of great bodily injury, robbery with

27  use of a firearm, and resisting an officer with use of a firearm.  On June 24, 2002, Petitioner was

28  sentenced to 49 years in state prison.  (CT 139-44, 255-58; RT [4/11/02] 7-10; RT [6/24/02] 22-28.)

Answer to Petition for Writ of Habeas Corpus; Points and Authorities in Support Thereof

3.    Petitioner appealed to the California Court of Appeal, Third Appellate District, case number C041719. After briefing by the parties (Lodged Doc. #1 [appellant's opening brief]; Lodged Doc. #2 [respondent's brief]; Lodged Doc. #3 [appellant's letter submitting case without a reply brief]), the California Court of Appeal reduced Petitioner's sentence to 36 years, 4 months, and affirmed the judgment as modified on October 31, 2003. (Lodged Doc. #4 at 6-7.)

4.    Petitioner did not petition for review in the California Supreme Court.

5.    On November 14, 2003, Petitioner filed a habeas corpus petition in the California Superior Court, County of Butte, case number CM014629. (Lodged Doc. #5.) The petition was denied in a reasoned decision dated January 5, 2004. (Lodged Doc. #6.)

6.    On February 5, 2004, Petitioner filed a habeas corpus petition in the California Court of Appeal, Third Appellate District, case number C046066. (Lodged Doc. #7.) The petition was denied without comment on February 26, 2004. (Lodged Doc. #8.)

7.    On April 12, 2004, Petitioner filed a habeas corpus petition in the California Supreme Court, case number S123976. (Lodged Doc. #9.) The petition was denied without comment on March 2, 2005. (Lodged Doc. #10.)

8.    On June 15, 2005, Petitioner filed a federal petition for habeas corpus relief. (Docket entry #1.)

9.    On June 22, 2005, the Court ordered Respondents to file a response. (Docket entry #4.)

10.    The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) controls the disposition of this case since the petition was filed several years after the enactment of AEDPA.

11.    Petitioner's grounds for relief were presented to the state's highest court on habeas corpus and appear to be exhausted. Should the Court find any of the claims unexhausted, Respondents do not waive the exhaustion requirement. 28 U.S.C. § 2254(b)(3). If any of Petitioner's grounds for relief are unexhausted, the Court may nevertheless deny them on the merits where it is perfectly clear there is no colorable federal claim. 28 U.S.C. § 2254(b)(2).

12.    Respondents deny that Petitioner is entitled to relief.

13. Respondents deny the allegation set forth in Ground One that Petitioner was deprived of effective assistance of counsel based on counsel's investigation of an insanity defense and his decision to abandon that defense. Petitioner's claim is precluded by his subsequent no contest plea. If the Court finds this ground for relief is exhausted because it would be defaulted if properly presented to the state court, then the default forecloses federal review.

14. Respondents deny the allegation in Ground Two that Petitioner's federal constitutional rights were violated by the manner in which the court received his no contest plea. If the Court finds this ground for relief is exhausted because it would be defaulted if properly presented to the state court, then the default forecloses federal review.

15. Respondents deny the allegation set forth in Ground Three that Petitioner was deprived of the effective assistance of appellate counsel. If the Court finds this ground for relief is exhausted because it would be defaulted if properly presented to the state court, then the default forecloses federal review.

16. Petitioner has not demonstrated entitlement to an evidentiary hearing on any ground.

17. In addition to the Clerk's Transcript on Appeal (1 volume, 260 pages) and the Reporter's Transcript on Appeal (one volume 28 pages in length and one volume 10 pages in length), Respondents will lodge the following items shortly after the filing of this answer:

Document #1 . . . . Appellant's Opening Brief on direct appeal;

Document #2 . . . . Respondent's Brief on direct appeal;

Document #3 . . . . Appellant's letter submitting his appeal without a reply brief;

Document #4 . . . . Opinion of the California Court of Appeal;

Document #5 . . . . Petition for Writ of Habeas Corpus in the Butte County Superior Court;

Document #6 . . . . Opinion of the Butte County Superior Court;

Document #7 . . . . Petition for Writ of Habeas Corpus in the California Court of Appeal;

Document #8 . . . Order by the California Court of Appeal;

Document #9 . . . Petition for Writ of Habeas Corpus in the California Supreme Court;

Document #10 . . . Order by the California Supreme Court; and

Document #11 . . . Amended Abstract of Judgment.

1      18.  Because Petitioner has failed to demonstrate that he is entitled to relief, Respondents

2  respectfully request the Petition for Writ of Habeas Corpus be denied.

3      Dated:  September 21, 2005

4                         Respectfully submitted,

5                         BILL LOCKYER
                          Attorney General of the State of California

6                         ROBERT R. ANDERSON
                          Chief Assistant Attorney General

7
                          MARY JO GRAVES
8                         Senior Assistant Attorney General

9                         BRIAN R. MEANS
                          Supervising Deputy Attorney General

10
                          /s/  Brian G. Smiley
11
                          BRIAN G. SMILEY
12                        Deputy Attorney General

13                        Attorneys for Respondents

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Answer to Petition for Writ of Habeas Corpus; Points and Authorities in Support Thereof

4

# MEMORANDUM OF POINTS AND AUTHORITIES

## STATEMENT OF THE CASE

On November 14, 2000, an information was filed that was later amended to charge Petitioner as follows:

Count One:  Violation of Penal Code[1] section 209(b)(1), kidnapping to commit the robbery of a cab driver, occurring on September 24, 2000.  It was further alleged as to this count that Petitioner used and discharged a shotgun causing great bodily injury within the meaning of sections 12022.5(a)(1) and 12022.53(b)-(d).

Count Two:  Violation of section 245(d)(1), assault with a firearm on a peace officer, occurring on September 24, 2000.  It was further alleged as to this count that Petitioner personally used a shotgun within the meaning of sections 12022.5(a)(1) and 12022.53(b).

Count Three:  Violation of section 207, kidnapping.  Firearm violations within the scope of sections 12022.53(c) and 12022.7 were also alleged.

Count Four:  Violation of section 211, first degree robbery, with a personal firearm use violation within the scope of section 12022.53(b).

Count Five:  Violation of section 69, resisting a public officer, with a personal firearm use allegation pursuant to section 12022.5.

(CT 11-13, 139; RT [4/11/02] at 2-6.)

On April 11, 2002, Petitioner pleaded no contest to counts two, three, four and five. Petitioner admitted all the enhancements that accompanied those counts.  Count one was dismissed. (CT 139-44; RT [4/11/02] at 7-10.)

On June 24, 2002, Petitioner was sentenced to 49 years in state prison.  (CT 255-58; RT [6/24/02] at 22-28; *see* Lodged Doc. #2 at 2-3 n.3 (explaining Petitioner was sentenced to 49 years rather than 43 years).)

On July 18, 2002, Petitioner filed a notice of appeal.  (CT 259.)

The procedural history of Petitioner's post-conviction proceedings is explained in the attached Answer at paragraphs three through nine.

---

1.  Further statutory references are to the California Penal Code unless stated otherwise.

# STATEMENT OF FACTS[2]

The following information was obtained from the Chico Police Department (CPD) Report #00-6388.

On September 24, 2000, at approximately 5:16 a.m., a CPD officer was at Enloe Hospital on an unrelated matter when Lynetta D. ran into the emergency room shouting, "This man has been shot." The officer observed Greg Bart (the victim) lying in the back of a vehicle outside of the hospital. It appeared the victim was bleeding from his right shoulder, as his upper torso was covered in blood.

In an interview, Lynetta D. stated she was delivering newspapers when the victim stood in her lane of traffic, forcing her to stop her vehicle. He walked to the passenger side door and explained he had been shot and his taxicab had been stolen. He requested that she transport him to a telephone. She agreed and told the victim to get into the back of her vehicle. She then transported the victim to Enloe Hospital for treatment.

The victim was moved into the emergency room for treatment. Upon further examination, it was determined the victim had a gunshot wound to his right upper arm. From the appearance of the wound, it appeared the victim had been shot at close range. The wound was approximately four inches wide and seven inches long. The muscle was missing, displaying the bone.

The victim stated he was employed as a driver by American Taxi. He responded to an apartment complex on California Park Drive to pick up a fare, however, he was unable to locate the fare. While leaving, he was flagged down by Edward Don Brown, Jr. (the defendant), who requested transportation. The defendant entered the vehicle and sat in the middle of the rear seat. The defendant introduced himself as "Mike" and said he was intoxicated. The defendant requested to be transported to a residence on Hicks Lane, although he did not know the specific address and did not have any money to pay for the transportation. The victim stopped the vehicle to talk to the defendant when he noticed the defendant had a short-barreled shotgun in his hand. The defendant instructed the victim to drive to Hicks Lane and stated he would then decide if he was going to take the victim's money or not. The victim continued to drive and attempted to signal another taxi cab driver that he needed help. However, his effort was unsuccessful. The defendant told the victim not to make any kind of signal to other drivers.

The victim said he feared for his life and decided he would escape from the vehicle when he stopped for a red traffic signal light. When he stopped, he grabbed his bag of receipts and cash ($242.00), opened the driver's side door, felt and heard the shotgun blast, stepped out of the vehicle, and began emptying his pockets. The victim thought if the defendant was going to rob him, he might as well make it easier and perhaps the defendant would not shoot him again. The victim said he began to run toward the Enloe outpatient building. He heard the defendant exit the vehicle and run behind him for a short while. The defendant then returned to the vehicle and drove away. The victim said he returned to collect his bag of receipts and cash. He then saw Lynetta D. in her vehicle, so he ran to her for help and she transported him to the hospital.

---

2. Because there was no trial and the issues on appeal were limited to sentencing, the following factual summary is taken from the Probation Officer's Report.

At approximately 5:20 a.m., Brian O., a witness, telephoned 9-1-1 to report he saw a possible robbery and shooting of an American Taxi Cab Company driver on California Park Drive. Brian O. and his girlfriend Gabriella S. stated they heard a gunshot and witnessed the victim "fall out" of the vehicle. The victim stood up and walked away from the vehicle. He appeared to be favoring his shoulder and leaning to one side. At the same time, the defendant exited the rear seat of the taxicab. He moved toward the front of the vehicle and appeared to be holding a gray, two-foot long object. He then began moving toward the victim and Brian O. heard shouting although he could not specifically hear what was said. The victim kept moving away from the defendant until the defendant turned around and headed toward the taxicab.

Officers were dispatched to the scene (California Park Drive) however; they were unable to locate the taxicab or victim (who had already been transported to the hospital). Officers contacted Danny H. and John M., whom had located coins (U.S. currency), a pair of eyeglasses, a check draft, a spent shotgun shell, business cards, papers, blood, receipts, a wallet, a moneybag, a pack of cigarettes, and a live shotgun shell. Officers then received notice of a traffic collision on Manzanita Avenue in front of Hooker Oak Park. Officers located the missing taxicab. The engine was running although there were no occupants. The officers were advised that the defendant might be armed with a weapon.

The officer advised dispatch of the events. A few minutes later, another CPD officer located the defendant in the Hooker Oak Recreation Area parking lot. The officers noted the defendant was armed with a bolt-action sawed-off shotgun. While additional officers were responding, the defendant waived the shotgun around. In response, the officers told the defendant to put the gun down several times[;] however, the defendant continued to wave the gun around while yelling "Fuck you, cops. Go ahead and shoot me." The defendant then lowered the gun to a shooting position and took aim. The officer was forced to shoot the defendant. As backup officers arrived the defendant was taken into custody and the weapon was secured. An officer noted the defendant appeared to be bleeding from the back of his head and upper torso. Additionally, the defendant had a strong odor of alcoholic beverage emitting from his person. Medical person[ne]l arrived and assumed care of the defendant. A search of the scene revealed a spent shotgun shell in the ground. The defendant was transported to Enloe Hospital for treatment. Upon processing the crime scene, officers located a spent shotgun shell, bloody clothing, a pair of shoes, a wallet, a pack of cigarettes, a pair of socks, a leatherman tool, a small flashlight, an empty Gatorade bottle, and three pools of blood.

While at the hospital, a medical staff member provided the officer with blood test results. The officer noted the defendant tested positive for methamphetamine, marijuana, and alcohol. Additionally, the officer noted the defendant's injuries to include a wound to the right of his right eye, a wound on his right front shoulder, two wounds to his right upper arm, and five additional wounds to his lower right arm and hand. The officer contacted the defendant who said, "Why did you guys shoot me? I was putting my hands up. You must have thought I had a gun." He paused for a moment and said, "Maybe I was being an asshole or something. That's why you shot me. You should have shot me in the head. I'd be better off." The defendant denied possessing a gun and said, "tell the officer I'm sorry. I wish you guys would have shot me dude. Why didn't I just be good?" The defendant was moved to the operating room for surgery to repair the radical bone that was shattered and remove the shotgun pellets in his arm.

The victim was taken to the operating room to repair the damage to his right arm. The physician noted there was much soft tissue damage with portions of the triceps missing. Located within the wound were a wad and multiple pellets that appeared to be from a 12-gauge shotgun. The wound ws closed with an unknown amount of sutures. The victim's release date and prognosis is undocumented.

Another officer contacted witness Brian O., who stated [he] heard a single gun shot and then observed the defendant exit the passenger side of the taxicab. The victim exited the driver's door and began to walk away from the taxicab with an unknown object in his hand. The defendant appeared to follow the victim for a short while and then returned to the taxicab.

The investigating officers responded to the apartment complex on California Park Drive where the telephone call for a taxicab had been made. The officers noted this was the residence of Roxanne High and her daughter (age unknown). Upon contact, Ms. High stated she knew the defendant and he was a friend of her son's (age unknown). The defendant had spent the night at her residence. He was intoxicated and saying "stupid things" such as blaming his father for his homelessness, not having a job, and being addicted to drugs. The defendant sat on Ms. High's couch listening to music and consuming a bottle of Peach Schnapps. Ms. High said the defendant was very angry with his father and had commented that he wanted to shoot his father with a shotgun that he had "stashed" somewhere. However, Ms. High had never seen the shotgun. Later, in the early morning hours, the defendant asked her if she would transport him to his father's residence so he could "shoot him." When Ms. High refused, the defendant walked to the telephone and called a taxi. She said he walked out to the patio and returned carrying a sleeping bag in a peculiar way (at a 45 degree angle). He then exited the apartment carrying the sleeping bag and the bottle of Peach Schnapps.

Ms. High's daughter was also interviewed. She stated the defendant was at the residence and appeared intoxicated. He was "talking like a fool." He made a statement about going to his father's residence on Hicks Lane to shoot him. She said she believed the defendant's father called the defendant "lazy" and this upset him. She also remembered the defendant telephoning for a taxicab. She said the defendant told her several times about a sawed-off shotgun he owned although she did not see the weapon. She stated on the evening previous to the instant offense, the defendant talked about shooting his father and then shooting himself. She said, "I think Ed wanted to die." He also talked about committing a home invasion robbery in the past.

Ramon M. contacted the Chico Police Department to report he witnessed the defendant chase the victim on California Park Drive. He thought the victim may have been hurt due to the way he was limping. The defendant appeared to have something in his right hand that he was attempting to conceal. Ramon M. said the defendant chased the victim for a short while and then returned to the taxicab and drove away. Ramon M. said he saw the victim attempt to wave him down but he was afraid the victim might be armed.

Ramon M. was shown a photographic lineup and positively identified the defendant as the person he witnessed chasing the victim.

The investigation officers contacted the defendant's stepmother, Laura Brown, and his father, Edward Brown Sr., at their residence on Hicks Lane. Mr. and Mrs. Brown were advised of the instant offense. Mr. Brown said his son was an extremely lazy person. He said, "some weeks ago I had to kick him out because, he was not working." Mr. Brown stated he knew the defendant had a drug problem (methamphetamine and marijuana) and wanted to commit suicide. He said the defendant has had a history of mental problems for a long time. In 1998 he was admitted to the Butte County Behavioral Health Department pursuant to §5150 W&I because he ingested rat poison and acid due to the fact that he thought he was homosexual.

Mr. Brown said the last time he saw the defendant was approximately three weeks prior to the instant offense. The defendant arrived at Mr. and Mrs. Brown's residence, ate dinner, and experienced an "enjoyable evening."

On September 25, 2000, the investigating officers arrived at Enloe Hospital and contacted the victim. They showed him a photographic line up and he postively identified the defendant as the person who shot him.

The officers then proceeded to the defendant's hospital room. As they walked into the room the defendant said, "Where is my lawyer. Just so you know I ain't answering any questions without my lawyer. An officer advised the defendant he was under arrest. As the officer advised the defendant of his Miranda rights, the defendant said "I know my rights." The defendant began to recite the Miranda Warning and then said "the voices, they wouldn't fucking stop." He said the "voices" had been talking to him all week long and making him feel "shitty" about everything. The voices were telling him to hurt himself. He then said "they are just going to stick me in a mental institution, I'm cool but I'd rather go to jail."

The defendant talked about how "messed up" his life was and said, "I just wanted to die. That is why I was trying to get those cops to shoot me. But they shot me in the arm and fucking teased me with that bullshit." The defendant refused to answer any questions about the shotgun. He then went on to say, "I was shooting up a bunch of dope, the voices kept getting louder and louder. They told me to kill myself because of the molestation that happen to me when I was growing up, but I did not want to think about it anymore."

The defendant said, "I don't know what happen, the gun just went off. It was an accident. I was talking to the guy. I did not know it was loaded. He jumped out of the car and the gun just went off. I do not think I pulled the trigger." The defendant asked how the victim was doing and then the interview was terminated.

The defendant's mother, Joanie Schnitter, contacted the investigating officer at the Chico Police Department. Mr. Schnitter stated during the time she and the defendant's father were married there was "a lot" of domestic violence and drug abuse. She reported the defendant's cousins molested the defendant at the age of 2 ½. She personally witnessed the defendant's 10 year old cousin sodomize him. She counseled both children however, did not think this was the first incident. She first noticed the defendant had an "abnormally volatile temper" when he was two or three years old. By the time he was 10 years old, he began to steal and vandalize things within the neighborhood. When he was 12 years old he went to reside with his father for two years. During that time he began using illegal drugs and sniffing gasoline, which made him even more violent and anti-social. When he turned 14 years old his father was arrested and convicted of possessing methamphetamine. When he was 15 years old he was arrested in Tehema County, held in juvenile hall, and placed on probation for violations of §10851(a) and §594(a) PC as he stole a vehicle and lit a telephone pole on fire. He refused to attend counseling and was living on his own as a transient. She said he went on a "spree of stealing" and was arrested for a probation violation.

Mrs. Schnitter stated she had seen the defendant in possession of a shotgun as it was found in his bedroom under his mattress. She removed the weapon and hid it at a neighbor's residence. A couple of days later the defendant demanded to know where the weapon was, as he needed to return it to the owner, who was threatening to beat him up if it was not returned. Mrs. Schnitter said she retrieved the weapon and personally handed it to the defendant. When shown a photograph of the weapon in the instant offense, she stated it was in fact the same weapon she had seen earlier in the defendant's bedroom.

Mrs. Schnitter said approximately two weeks prior to the instant offense, she and her husband told the defendant to leave their residence because he was "extremely lazy" and was not willing to seek employment. She said the defendant is "extremely depressed and a danger to society." She said he needs "mental help."

Mrs. Schnitter was allowed to visit the defendant in the hospital under the supervision of the investigating officer. The defendant was advised that the visit would not be confidential and was again advised of his Miranda rights. As Ms. Schnitter entered the room, she and the defendant embraced. The defendant said, "I'm very very sorry that someone got hurt. See, I tried to get the cops to shoot me but it did not work. I wanted to be dead right now. It is the only reason I pointed the gun at the cops." At this point the investigating officer resumed his interview with the defendant. The defendant stated he telephoned for a taxi while at Ms. High's residence because he wanted to go to Hooker Oak Park to kill himself. After he entered the taxicab, he told the driver he did not have any money and the driver began to "flip out." He said, "I pointed the gun at him and was just going to scare him so he would take me to the park but it did not work." The defendant stated he had obtained the shotgun approximately one week prior to the instant offense but would not elaborate any further. The defendant said he did not remember asking the taxicab driver to transport him to Hicks Lane. As the officer recounted the events, the defendant became agitated and said, "I made the phone call. I did the whole fucking thing dude. I did it step by step. I am not talking anymore without my lawyer."

On September 27, 2000, the investigating officers obtained a search warrant for the telephone records of Ms. High's residence. According to records, a telephone call was placed from the residence to American Taxi Company on the date of the instant offense.

On October 4, 2000, the investigating officers re-contacted Roxanne High's daughter. She stated the defendant had talked about killing a police officer and killing himself in the past. She said when the defendant was "high" he would talk about "killing himself and having a shoot out with the cops." He thought all his friends would think it was cool and hold him to a "higher level."

(CT 150-157.)

## STANDARD OF REVIEW

Because the petition was filed several years after the enactment of AEDPA, its provisions govern this case. A critical part of AEDPA provides that the Court may grant a writ of habeas corpus *with respect to claims that were adjudicated on the merits* in state court only if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or if the ruling was "based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d). In this case, however, the last reasoned state court decision rejected Petitioner's grounds for relief as "vague, unsupported, and conclusory allegations" that were "insufficient to allow for intelligent consideration of the issues," and hence no prima facie case for relief was established. (Lodged Doc. #6 (citing *In re Swain*, 34 Cal.2d 300 (1949), *In re Patton*, 178 Cal. 629 (1918), & *In re Lawler*, 23 Cal.3d 190, 194 (1979)).) The California Court of Appeal and the California Supreme Court each denied relief without comment, presumably for the same reason articulated by

1   the superior court.[3/]  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) (adopting the presumption

2   that "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained

3   orders upholding that judgment or rejecting the same claim rest upon the same ground.").  Since the

4   state court did not analyze Petitioner's claims on the merits, the deferential standard of 28 U.S.C.

5   § 2254(d) does not apply.  *See Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002) ("For claims

6   for which no adjudication on the merits in state court was possible, however, AEDPA's standard of

7   review does not apply.").  Therefore, the correct standard of review is de novo.  *Id.*

8           In the event the Court concludes that an error of federal constitutional dimension has

9   occurred, relief may only be granted if the error had a "substantial or injurious effect" on the verdict.

10  *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993); *see Boardman v. Estelle*, 957 F.2d 1523, 1530

11  (9th Cir. 1992) (noting that "[m]ost errors of Constitutional magnitude are subject to harmless error

12  analysis. . . .").

13                                  **ARGUMENT**

14                                      **I.**

15  **GROUND 1:  PETITIONER HAS FAILED TO SUSTAIN HIS BURDEN
    OF  DEMONSTRATING  ENTITLEMENT  TO  FEDERAL  HABEAS**

16  **RELIEF ON THE GROUND THAT HE WAS DENIED EFFECTIVE
    ASSISTANCE OF COUNSEL**

17

18          Prior to trial Petitioner entered a plea of not guilty by reason of insanity.  (CT 112;

19  RT [6/18/01] 6.)  The trial court appointed two experts to examine Petitioner and both concluded

20  that Petitioner was not insane at the time he committed his offenses.  (CT 119, 123, 135-36.)

21  Consequently, Petitioner's trial attorney, Dennis Hoptowit, decided not to pursue an insanity

22

23

24  _____

25          3.  As noted in the attached Answer at paragraph 11, Respondents believe the grounds for
    relief were properly presented for purposes of the federal exhaustion requirement, notwithstanding

26  the state superior court's finding that the allegations were insufficient to allow for intelligent
    consideration of the issues.  *See Kim v. Villalobos*, 799 F.2d 1317, 1319-20 (9th Cir. 1986) (finding

27  that, if the petitioner alleges that his claims were alleged with sufficient factual particularity, the
    federal court is not precluded from independently examining whether the federal standard for fair

28  presentation has been met).

defense. [4] (RT [4/11/02] 11.)  Petitioner now claims that trial counsel was ineffective because counsel failed to adequately investigate and produce evidence that Petitioner suffered from a developmental disability.[5]  (Pet. 5-(5b).)  The claim is barred by Petitioner's no contest plea; moreover, the investigation supporting counsel's decision to abandon the insanity defense was thorough and well within prevailing professional norms.

Ground One should be rejected because it has been precluded by Petitioner's no contest plea.  In *Tollett v. Henderson*, 411 U.S. 258, 267 (1973), the Supreme Court stated:

> [A] guilty plea represents a break in the chain of events which has preceded it in the criminal process.  When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea.  He may only attack the voluntary and intelligent character of the guilty plea . . . .

*See also Hill v. Lockhart*, 474 U.S. 52, 56-57 (1985).  Because Ground One does not challenge the voluntariness of the plea, but instead challenges counsel's effectiveness with respect to events that preceded Petitioner's plea, federal review is foreclosed.

Alternatively, Ground One fails on the merits.  The standard governing claims of ineffective assistance of counsel was clearly established in *Strickland v. Washington*, 466 U.S. 668 (1984).  The *Strickland* test has two parts.  First, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Id*. at 688.  The Supreme Court has described this level of performance as "gross incompetence." *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986).  Second, a petitioner must show that his defense attorney's gross incompetence prejudiced his defense, i.e., that "there is a reasonable probability that, but for counsel's

---

4.  Mr. Hoptowit is a graduate of Stanford University Law School who had more than 25 years of experience at the time the charges were brought against Petitioner.  *See* http://members.calbar.ca.gov.

5.  Ground One repeatedly refers to the need to establish a "developmental disability" and is accompanied by citations to section 1367, et seq.  (Pet. 5-(5b).)  It thus appears that Petitioner's argument is based upon standards for determining a defendant's competency to stand trial, rather than a defendant's sanity at the time the offenses were committed.  *Compare* § 1367, et seq., *with* §§ 25, 25.5, & 1026, et seq.

1  unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S.

2  at 694.  The *Strickland* standard is "highly demanding."  *Kimmelman*, 477 U.S. at 382.

3       In evaluating the performance of defense counsel in the present context, where the claim

4  challenges counsel's abandonment of a defense, the Supreme Court's decision in *Wiggins v. Smith*,

5  539 U.S. 510 (2003), is instructive.  Under *Wiggins*, the principal concern in deciding whether

6  counsel exercised reasonable professional judgment is not whether he should have presented a

7  particular defense.  *Id.* at 522-23.  Rather, the Court must focus on whether the investigation

8  supporting counsel's decision not to present a defense was itself reasonable. *Id.* at 523.  As applied

9  to the facts of this case, the issue is not whether counsel erred in abandoning the insanity defense,

10  but whether defense counsel's investigation of an insanity defense was itself reasonable.

11       Petitioner has failed to demonstrate that the investigation underlying counsel's decision

12  to abandon the insanity defense was below prevailing professional norms.  Counsel was aware of

13  Petitioner's history of mental instability and changed Petitioner's plea to guilty by reason of insanity

14  on June 18, 2001. (CT 112; RT [6/18/01] 6.)  The change of plea triggered the trial court to appoint

15  a board certified psychiatrist, Dr. Thomas J. Lancaster, M.D., to examine Petitioner. (CT 113.)  Dr.

16  Lancaster conducted a thorough examination of Petitioner and issued a four-page report and a

17  one-page addendum that concluded Petitioner "does not suffer from a mental illness and was legally

18  sane at the time of the offense." (CT 116-119, 123.)  A second expert, licensed psychologist and

19  qualified medical examiner Paul R. Wuehler, Ph.D., was also appointed to conduct an independent

20  evaluation of Petitioner's sanity.  (CT 121-22; RT [8/27/01] 8.)  *See* § 1027(a) (requiring the

21  appointment of two experts to examine a defendant who enters a plea of insanity).  Dr. Wuehler filed

22  an exhaustive thirteen-page report on October 2, 2001, concluding that "the defendant, at the time

23  of the alleged instant offenses, was not incapable of understanding the nature and quality of his act

24  nor incapable of distinguishing right from wrong." (CT 136.)  Counsel decided to abandon the

25  insanity defense based in large part on these two reports:

26           Your Honor, for the record, as the Court knows, this case has a lengthy history.  This
            Court was not the Court who heard the preliminary hearing.  I would ask the Court to
27       review that transcript before sentencing, because I made some representations to the Court
            regarding Mr. Brown's history and personal background.  In addition, I at one point had

28

1   initiated a 1368[6] on behalf of Mr. Brown. As the court knows, we entered a dual plea
2   of not guilty and not guilty by reason of insanity, and he was evaluated by two
    psychiatrists. I can indicate to the Court, Mr. Brown has a long history of mental health
3   problems and, number one, in evaluating those, *and based on the reports, I do not believe
    that they would serve to be effective defenses to the charges* wherein Mr. Brown faced at
4   least one, if not two, potential life sentences; and it was based upon that consideration as
    well as the facts of the case and my discussions with Mr. Brown that led to him accepting
5   the offer from the People, which was substantially better than the original offer, the
    original offer being, I believe, 28 years to life. Even though this has more years, it is a
6   determinate sentence, and Mr. Brown will in fact be legally and otherwise eligible for
    parole upon completion of his determinate sentence.

7   (RT [4/11/02] 11-12 (emphasis added).)

8           Surely counsel's examination of two expert opinions regarding Petitioner's sanity, coupled

9   with counsel's personal research and knowledge of Petitioner's "long history of mental health

10  problems," RT [4/11/02] 11, constituted reasonable investigation of the insanity defense. *Hendricks*

11  *v. Calderon*, 70 F.3d 1032, 1038 (9th Cir. 1995) ("In general, an attorney is entitled to rely on the

12  opinions of mental health experts in deciding whether to pursue an insanity or diminished capacity

13  defense."). Petitioner faults his attorney for not hiring his own expert (Pet. (5b)); however, because

14  the two court-appointed experts conducted independent evaluations, the Constitution did not

15  mandate the defense hire a third expert. Moreover, much of the evidence that Petitioner says

16  counsel should have gathered in support of an insanity defense, *see* Pet. at (5b), was known by the

17  experts who nonetheless concluded there was no insanity at the time of the offenses. (CT 118, 128-

18  132.) An insanity defense depends on a failure to appreciate right from wrong *at the time of the*

19  *offenses*, thus making the past mental history upon which Petitioner focuses non-dispositive on the

20  question whether an insanity defense is viable. *See* § 25 (insanity requires the defendant show "he

21  or she was incapable of knowing or understanding the nature and quality of his or her act and of

22  distinguishing right from wrong at the time of the commission of the offense") and § 1026

23  (explaining that a plea of insanity inquires "whether the defendant was sane or insane at the time the

24  offense was committed . . . ."). On this record, Petitioner has fallen far short of establishing that his

25  _____

26          6. As stated in the previous footnote, section 1368 is a statute addressing a defendant's
    competency to stand trial. Counsel probably meant to cite section 1026 concerning sanity, or
27  perhaps he was mistaken regarding the existence of proceedings pursuant to section 1368. (*See*
    RT [6/18/01] 2 (on one other occasion counsel mistakenly thought there had been an inquiry into
28  Petitioner's competency to stand trial).)

Answer to Petition for Writ of Habeas Corpus; Points and Authorities in Support Thereof

1   attorney's investigation of an insanity defense was deficient.

2          Furthermore, there is no reasonable probability an insanity defense would have been

3   successful.  The two court-appointed experts reached the same conclusion:  Petitioner was not insane

4   when he committed the offenses.  Even if Petitioner could have unearthed a defense expert to say

5   that he was insane, it is doubtful that a jury would have been persuaded once they heard two neutral

6   court-appointed experts testify they did not believe Petitioner was insane.  Thus, Petitioner has failed

7   to demonstrate that he was prejudiced by his attorney's allegedly deficient investigation and research

8   of his insanity defense.

9          Petitioner was not deprived of his Sixth Amendment right to effective representation.

10                                              **II.**

11   **GROUND 2:   PETITIONER HAS FAILED TO DEMONSTRATE
     ENTITLEMENT TO FEDERAL HABEAS RELIEF BASED ON THE**

12   **MANNER IN WHICH THE TRIAL COURT RECEIVED HIS NO
     CONTEST PLEA**

13

14          Petitioner contends that his Fifth, Sixth and Fourteenth Amendment rights were violated

15   when the trial court failed to "personally" take a waiver of his rights when he entered his no contest

16   plea.[7]  (Pet. (5c)-(5d).)  The claim is devoid of merit.

17          A guilty plea "is constitutionally valid only to the extent it is 'voluntary' and 'intelligent.'"

18   *Bousley v. United States*, 523 U.S. 614, 618 (1998); *Brady v. United States*, 397 U.S. 742, 748

19   (1970).  Due process requires that a guilty plea be both knowing and voluntary because it constitutes

20   the waiver of three constitutional rights: the right to a jury trial, the right to confront one's accusers,

21   and the privilege against self-incrimination.  *Parke v. Raley*, 506 U.S. 20, 29 (1992); *Boykin v.*

22   *Alabama*, 395 U.S. 238, 242-43 (1969).  The test for determining the validity of a guilty plea is

23   "'whether the plea represents a voluntary and intelligent choice among the alternative courses of

24   action open to the defendant.'"  *Park v. Raley*, 506 U.S. at 29 (quoting *North Carolina v. Alford*, 400

25   U.S. 25, 31 (1970)).  This requires a review of the circumstances surrounding the plea.  *See Brady*,

26

27   _____

28          7.  In California, a no contest plea is considered the same as a guilty plea.  *People v.*
     *Bradford*, 15 Cal.4th 1229, 1374-75 (1997) (citing § 1016).

Answer to Petition for Writ of Habeas Corpus; Points and Authorities in Support Thereof

1   397 U.S. at 749.  Naturally, a court is allowed some discretion when deciding how detailed it must

2   be when probing the voluntary and intelligent character of a guilty plea.  *See, e.g.*, *Bargas v. Burns*,

3   179 F.3d 1207, 1215-16 (9th Cir. 1999) (explaining that a court should decide if a particular element

4   of an offense merits discussion with the defendant pleading guilty to that offense).

5          A habeas petitioner bears the burden of establishing that his guilty plea was not knowing

6   and voluntary.  *Parke v. Raley*, 506 U.S. at 24.  A defendant's representations, as well as any

7   findings made by the judge accepting the plea, constitute a formidable barrier to challenging the

8   validity of a plea.  *Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977).

9          It is evident from the record that Petitioner knowingly and voluntarily entered his plea.

10  First, Petitioner initialed and signed a written plea form that explained in detail the terms of his plea

11  agreement and the rights that he was giving up.  (CT 140-44.)  In particular, Petitioner initialed

12  boxes that expressly stated that he understood he was waiving his constitutional rights to a jury trial,

13  to confront all witnesses against him, and to remain silent.  (CT 141.)  Second, the trial court

14  engaged Petitioner in a colloquy designed to ensure that Petitioner's plea was knowing and

15  voluntary.  (RT [4/11/02] 6-7.)  During that colloquy Petitioner assured the court that he read and

16  understood the felony plea form that he signed, that he had no questions, that he had had enough to

17  time to speak with his attorney about the consequences of his plea, that he was pleading freely and

18  voluntarily, and that he was not entering his plea under any threats.  (*Id*.)  Third, the court questioned

19  Petitioner's attorney whether he had explained to Petitioner the elements of the crimes and special

20  allegations and the consequences of making the plea.  (*Id*. at 7.)  Petitioner's attorney assured the

21  court he had done so.  (*Id*. at 7.)  Fourth, the court elicited Petitioner's pleas and admissions with

22  respect to each individual charge and allegation consistent with the plea bargain.  (*Id*. at 8-10.)  By

23  taking each of these steps, the court ensured that the plea was entered voluntarily and intelligently.

24         Having had the opportunity to observe Petitioner's demeanor throughout the plea

25  proceeding, the court expressly found that Petitioner entered his plea knowingly and voluntarily:

26         The Court, after having reviewed the felony plea form and questioning Mr. Brown
       and counsel, is satisfied and makes the finding that Mr. Brown has voluntarily, expressly,
27     explicitly, knowingly, understandingly and intelligently waived his constitutional rights.
       The Court finds the defendant's pleas and admissions are freely and voluntarily made, that
28     he understands the nature of these charges and the consequences of the pleas and

1   admissions.  The Court accepts the stipulation to a factual basis and finds there is such.

2   (RT [4/11/02] 10.)

3          Petitioner argues that his plea was invalid because the court did not verbally review each

4   of the constitutional rights that he was waiving.  (Pet. (5c)-(5d).)  Petitioner cites to no federal case,

5   and Respondents are not aware of any, that finds a federal constitutional requirement that each right

6   be waived verbally.   A review of the circumstances surrounding Petitioner's plea makes it

7   abundantly clear that it was entered knowingly and voluntarily.  Accordingly, Petitioner has failed

8   to carry his burden of showing entitlement to relief based on Ground Two of the petition.

9                                        **III.**

10         **GROUND 3:    PETITIONER HAS FAILED TO DEMONSTRATE**
           **ENTITLEMENT TO FEDERAL HABEAS RELIEF ON THE GROUND**
11         **THAT HE WAS DENIED EFFECTIVE ASSISTANCE OF APPELLATE**
           **COUNSEL**
12

13         Liberally construed, Ground Three of the petition apparently alleges ineffective assistance

14  of appellate counsel because counsel waived unspecified "potentially meritorious" claims.  (Pet.

15  (5e).)  The claim is undeveloped, vague, conclusory, and without merit.[8/]  It therefore fails.

16         A criminal appellant is entitled to the effective assistance of counsel on his first appeal.

17  *Evitts v. Lucey*, 469 U.S. 387, 391-405 (1985).  The standard governing claims of ineffective

18  assistance of appellate counsel is the same as for trial counsel, discussed in Argument I, *ante*.  *Smith*

19  *v. Robbins*, 528 U.S. 259, 285 (2002) (noting that *Strickland* applies to claims involving the

20  effectiveness of appellate counsel).  Accordingly, Petitioner must show that his appellate attorney's

21  performance fell below an objective standard of reasonableness and that, but for appellate counsel's

22  errors, petitioner would have prevailed on appeal.  *Wildman v. Johnson*, 261 F.3d 832, 840 (9th Cir.

23  2001) (citing *Jones v. Smith*, 231 F.3d 1227, 1239 n.8 (9th Cir. 2000)).

24

25

26

27         8. Indeed, when this ground for relief was presented to the state courts it does not appear to
    have been a freestanding claim but rather an argument that Petitioner's other grounds for relief were
28  not untimely, waived, or defaulted.  (Lodged Doc. # 5 at 15-16; Lodged Doc. # 7 at 15-16; Lodged
    Doc. # 9 at 15-16.)

Answer to Petition for Writ of Habeas Corpus; Points and Authorities in Support Thereof

A criminal appellant's right to effective appellate counsel does not mean that appellate counsel has a constitutional duty to raise every non-frivolous issue requested by the appellant. *See Jones v. Barnes*, 463 U.S. 745, 751-54 (1983); *Gerlaugh v. Stewart*, 129 F.3d 1027, 1045 (9th Cir. 1997); *Miller v. Keeney*, 882 F.2d 1428, 1434 n.10 (9th Cir. 1989). Indeed, the Supreme Court has expressly stated that appellate counsel "should not" raise every nonfrivolous claim. *Smith v. Robbins*, 528 U.S. at 288. The weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy. *Miller*, 882 F.2d at 1434. For this reason, the Supreme Court has stated that "it is difficult to demonstrate that counsel was incompetent" "based on counsel's failure to raise a particular claim . . . ." *Smith v. Robbins*, 528 U.S. at 288 (also quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986) as follows: "'Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome'").

The federal petition is vague and conclusory because it does not identify what "potentially meritorious" constitutional claims appellate counsel allegedly ignored. (Pet. at (5e) (providing no specifics regarding allegedly omitted constitutional claims).) *See Odle v. Calderon*, 884 F. Supp. 1404, 1433 (N.D. Cal. 1995) ("Odle has not indicated specific claims that appellate counsel should have raised but did not; thus, he has not shown that appellate counsel's performance was defective."), *rev'd on other grounds sub nom. Odle v. Woodford*, 238 F.3d 1084 (9th Cir. 2001). Petitioner's failure to specify what issues should have been, but were not, raised prevents this Court from comparing the strength of omitted issues with the sentencing issues appellate counsel decided to press. Thus, there is no basis to conclude that an omitted issue was "clearly stronger than issues that counsel did present." *Smith v. Robbins*, 528 U.S. at 288.

Here, appellate counsel prepared a brief but chose to present only the strongest issues for appeal. Appellant's opening brief shows that appellate counsel challenged Petitioner's ten-year sentence for a gun-use enhancement and the sentences Petitioner received for Count 5. (Lodged Doc. #1 at 9-13.) In response, the People conceded error, lodged document number 2, and the California Court of Appeal reduced Petitioner's sentence. (Lodged Doc. #4 at 6.) The sentencing court prepared an amended abstract of judgment in accordance with the reduced sentence. (Lodged

Doc. #11.)   The fact that appellate counsel *successfully* challenged Petitioner's sentence and obtained a 12 year, 8 month reduction for Petitioner necessarily weighs strongly in favor of finding that he was competent.

For these reasons, Petitioner has failed to establish that he was denied his right to effective assistance of appellate counsel.

## CONCLUSION

The writ of habeas corpus is an extraordinary remedy reserved for those who have been "grievously wronged" by society. *Brecht v. Abrahamson*, 507 U.S. at 637.  In this case Petitioner has not shown that he has been grievously wronged.  He knowingly and voluntarily entered his no contest plea and received substantial benefits in return.  The government has honored its part of the bargain and Petitioner must honor his part.  Accordingly, Respondents respectfully request the petition for writ of habeas corpus be denied.

Dated:  September 21, 2005

Respectfully submitted,

BILL LOCKYER
Attorney General of the State of California

ROBERT R. ANDERSON
Chief Assistant Attorney General

MARY JO GRAVES
Senior Assistant Attorney General

BRIAN R. MEANS
Supervising Deputy Attorney General

/s/  Brian G. Smiley

BRIAN G. SMILEY
Deputy Attorney General

Attorneys for Respondents

BGS:mp
SA2005300420

Answer to Petition for Writ of Habeas Corpus; Points and Authorities in Support Thereof

1

## DECLARATION OF SERVICE BY U.S. MAIL

2  Case Name: ***Edward Don Brown v. Warden Yates, et al.***      No.:  **CIV S-05-1195 LKK DAD P**

3  I declare:

4  I am employed in the Office of the Attorney General, which is the office of a member of the
California State Bar at which member's direction this service is made.  I am 18 years of age or older

5  and not a party to this matter.  I am familiar with the business practice at the Office of the Attorney
General for collection and processing of correspondence for mailing with the United States Postal

6  Service.  In accordance with that practice, correspondence placed in the internal mail collection
system at the Office of the Attorney General is deposited with the United States Postal Service that

7  same day in the ordinary course of business.

8  On September 21, 2005, I served the attached **ANSWER TO PETITION FOR WRIT OF
HABEAS CORPUS; POINTS AND AUTHORITIES IN SUPPORT THEREOF** by placing a

9  true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal
mail collection system at the Office of the Attorney General at 1300 I Street, P.O. Box 944255,

10  Sacramento, California  94244-2550, addressed as follows:

11
   Edward Don Brown
12   T-60348
   [COR LD NTC] [PRO SE]
13   AG-207
   P.O. Box 409020
14   Ione, CA  95640

15  I declare under penalty of perjury under the laws of the State of California the foregoing is true and
correct and that this declaration was executed on September 21, 2005, at Sacramento, California.

16

17

18                                    /s/  Brian G. Smiley
                                    _____
19                                             Brian G. Smiley

20

21

22

23

24

25

26

27

28